**John S. TRINSEY, Jr.**

v.

**COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF STATE, BOARD OF ELECTIONS, the Governor and Secretary of the Commonwealth.**

**Civ. A. No. 91–2749.**

United States District Court, E.D. Pennsylvania.

June 10, 1991.

John S. Trinsey, Jr., pro se.

Jerome T. Foerster, Deputy Atty. Gen., for defendants.

## OPINION

CAHN, District Judge.

This case arose after the tragic death of Senator John Heinz on April 4, 1991 created a vacancy in Pennsylvania's representation in the United States Senate. The *pro se* plaintiff, John S. Trinsey, Jr., seeks a determination pursuant to 42 U.S.C.

§ 1983 [1] that 25 Pa.Stat.Ann. § 2776 violates the Seventeenth Amendment to the United States Constitution.

Section 2776, which governs the special election of United States Senators, provides, in relevant part,

> Whenever a vacancy shall occur in the office of United States Senator, said vacancy shall be filled for the unexpired term by the vote of the electors of the State at a special election to be held at the time of the next general or municipal election, occurring at least ninety (90) days after the happening of such vacancy.... Candidates to fill vacancies in the office of United States Senator shall be nominated by political parties, in accordance with the party rules relating to the filling of vacancies, by means of nomination certificates....

The plaintiff has filed a motion for a Temporary Restraining Order and a motion for a Preliminary Injunction. He also seeks, pursuant to 28 U.S.C. § 2201, a declaratory judgment that the statute is unconstitutional.[2] The Commonwealth has filed a memorandum opposing injunctive relief and has moved to dismiss the case. The court held a hearing on the matter on May 29, 1991.

## I. BACKGROUND

This plaintiff challenges the manner in which the Commonwealth of Pennsylvania fills vacancies in its Senatorial representation. The Seventeenth Amendment itself provides:

> When vacancies happen in the representation of any State in the senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided,* That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

Pennsylvania's legislature has directed that the two major political parties may choose, according to party rules, the nominees who will run in the general election. Both major parties nominate by party committee.

■ The plaintiff, who challenges the law as a Republican voter and as a potential Republican candidate,[3] focuses his attack on the nomination procedure for party candidates.[4] As a potential candidate, Mr. Trinsey complains that the statute operates to deny him an opportunity to participate in the Republican primary. As a voter, the plaintiff contends that this statute violates the Seventeenth Amendment to the United States Constitution because it "plac[es] the power to elect [a] Senator not in the hands of the People of Pennsylvania but rather in the hands of small groups of Republican

---

**1.** 42 U.S.C. § 1983 provides, in relevant part,

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

**2.** This court, construing the plaintiff's pleadings liberally, concludes that when he requests that the court set aside § 2776 as unconstitutional, *see* Complaint at 6, Trinsey is actually seeking a declaratory judgment that the statute is unconstitutional pursuant to 28 U.S.C. § 2201.

**3.** Trinsey has standing to sue both as a voter and as a prospective candidate. *See Gray v. Sanders,* 372 U.S. 368, 375, 83 S.Ct. 801, 805, 9 L.Ed.2d 821 (1963) (any person whose right to vote is impaired has standing to sue); *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75

L.Ed.2d 547 (1983) (independent candidate challenging Ohio's ballot access laws).

**4.** Originally, Trinsey also challenged the constitutionality of that portion of § 2776 providing that the Governor shall temporarily appoint a Senator and sought to enjoin Senator Wofford's appointment. Because the Seventeenth Amendment specifically provides for temporary appointments, the court denied the injunction at the hearing. The court also dismissed Trinsey's challenge to ballot access requirements imposed on independent candidates by the Commonwealth. Pennsylvania's requirements comply with constitutional norms identified by the Court in ballot access cases. *See generally Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714, *reh'g denied,* 417 U.S. 926, 94 S.Ct. 2635, 41 L.Ed.2d 230 (1974).

and Democratic Party Committee members." Answer to Motion to Dismiss at 1. The Commonwealth defends its law on the grounds that it protects valid and compelling state interests in protecting the integrity of the electoral process and limiting the term of an appointed Senator. Additionally, Pennsylvania argues that it has no constitutional duty to hold a primary election.

▆ The Eleventh Amendment does not bar this action because the plaintiff is seeking declaratory and injunctive relief only. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see also Melo v. Hafer,* 912 F.2d 628, 635 n. 5 (3d Cir.1990), *cert. granted* —— U.S. ——, 111 S.Ct. 1617, 113 L.Ed.2d 715 (1991). Moreover, civil rights plaintiffs may pursue Section 1983 claims for injunctive relief against state officials sued in their official capacity. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989); *Melo,* 912 F.2d at 635. The court will therefore turn to the merits of the plaintiff's claim.

## II. DISCUSSION

### A. *The Right to Vote*

The right to vote for Representatives and Senators has its foundation in the qualifications clauses of Article I and the Seventeenth Amendment. The Seventeenth Amendment provides that the Senatorial "electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures." U.S. Const. amend. XVII, § 1.[5] Article I contains an identical clause establishing the qualifications of the electors of the House of Representatives. U.S. Const. art. I, § 2, cl. 1.

Citizens of the United States therefore undeniably have a right to vote for their national representatives. *See United States v. Classic,* 313 U.S. 299, 314, 61

S.Ct. 1031, 1037, 85 L.Ed. 1368, *reh'g denied,* 314 U.S. 707, 62 S.Ct. 51, 86 L.Ed. 565 (1941) ("The right of the people to choose ... is a right established and guaranteed by the Constitution"); *see also Kauffman v. Osser,* 321 F.Supp. 327, 333 (E.D.Pa. 1971) (right to vote for members of Congress fundamentally based on Qualifications Clauses in the Constitution). It is well established that the right to vote is fundamental, *see, e.g., Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979); *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972); *Evans v. Cornman,* 398 U.S. 419, 422, 90 S.Ct. 1752, 1755, 26 L.Ed.2d 370 (1970); *Kramer v. Union Free School Dist.,* 395 U.S. 621, 626, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969); *Williams v. Rhodes,* 393 U.S. 23, 31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968); *Katzenbach v. Morgan,* 384 U.S. 641, 654, 86 S.Ct. 1717, 1725, 16 L.Ed.2d 828 (1966); *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 667, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966); *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964); *Gray v. Sanders,* 372 U.S. 368, 380, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963); *Classic,* 313 U.S. at 315, 61 S.Ct. at 1037; *Burdick v. Takushi,* 927 F.2d 469, 473 (9th Cir.1991), and is protected against private as well as state interference. *See Classic,* 313 U.S. at 314–15, 61 S.Ct. at 1037–38; *Ripon Soc'y v. National Republican Party,* 525 F.2d 567, 599 (D.C.Cir.1975) (Tamm, J., concurring); *see also Developments in the Law–Elections,* 88 Harv.L.Rev. 1111, 1158–59 (1975).

Furthermore, because "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement ... must be carefully and meticulously scrutinized." *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964). As the Court stated in *Wesberry, supra,*

> No right is more precious in a free country than that of having a voice in the

---

5. The original Constitution provided for election of Senators by state legislatures. U.S. Const,

Art. 1, cl. 3.

election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.

376 U.S. at 17, 84 S.Ct. at 535.

The issue before this court, whether the right to vote must be protected at the nomination stage, has not been squarely presented before. It is clear that the states could choose to run general elections without the prior selection of major political party nominees by primary or otherwise. *See Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 218, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986) (states could for administrative and financial reasons eliminate selection of major party nominees).

Pennsylvania, however, has chosen to have the major parties make nominations prior to the general election. Because the choice of party nominees plays a central role in determining the eventual electoral outcome, the question of whether those nominees must be chosen democratically is a valid one. *See Moore v. Ogilvie,* 394 U.S. 814, 818, 89 S.Ct. 1493, 1496, 23 L.Ed.2d 1 (1969) ("[a]ll procedures used by a State as an integral part of the election must pass muster against charges of discrimination or of abridgment of the right to vote."). In addressing this issue, the court will consider the history and language of the Amendment itself, as well as analogous Court precedent.

### B. *The Seventeenth Amendment and the Nomination Process*

The introduction in Congress of resolutions proposing a constitutional amendment to accomplish popular election of Senators began in 1825. During the early 1870's, members of the House rapidly increased the frequency with which they introduced such resolutions. Although the House repeatedly voted overwhelmingly in favor of such resolutions, the Senate resisted the change. In fact, the proposed amendment did not come to a vote in the Senate until 1911. 1 G. Haynes, *The Senate of the United States* 96–7 (1960). Thus, achieving popular election of Senators was no mean task; only after pressure for a constitutional convention grew did the Senate respond to the desire for popular election. *See* Sherman, *The Recent Constitutional Amendments,* 23 Yale L.J. 129, 146 (1913).

Most citizens were dissatisfied with the original manner of Senatorial election for numerous reasons. *See generally* G. Haynes, *supra,* at 85–95. However, the ability of political party leaders to control the Senatorial choice was a major motivation for reform. Those party managers had a "phenomenal skill in the manipulation of legislators ... out of all proportion to [their] hold upon the voters." 1 G. Haynes, *supra,* at 93.[6] One purpose of the Amendment, therefore, was to wrest control of the Senate from small elite groups who controlled the political parties. *See, e.g.,* 46 Cong.Rec. 2253 (1911) (statement of Sen. Beveridge) (popular election will correct situation whereby party managers choose Senators); 46 Cong.Rec. 1106 (1911) (statement of Sen. Borah) (framers of Constitution, when providing for states to elect Senators, did not foresee problem of dominance of party leaders).

Moreover, the Senate Report accompanying S.J. Res. 134, which eventually became the Seventeenth Amendment, treats nomination as a part of the general electoral process:

It should not be overlooked either that the election of Senators by popular vote would not only leave *the nomination*

---

**6.** A contemporary observer described one instance of party manager dominance as follows, On January 14 (1887), the Republican members of the Legislature of New York met in caucus and selected their candidate to succeed Mr. D.B. Hill. The most eminently qualified man in the State of New York (the Hon. Joseph H. Choate) was duly presented to the caucus. No other names were presented or mentioned. There are 151 Republican members of the present state legislature. A vote was taken, and seven members were found to be in favor of Mr. Choate. All the rest, with a notable exhibition of spontaneity, declared themselves in favor of Thomas C. Platt. A few days later Mr. Platt was formally elected. *Review of Reviews,* (February 1887) (cited in 1 G. Haynes, *supra,* at 93).

*and election* of the members of the legislature upon the simple issue of their fitness for that particular work, but it would place every candidate for the high place of Senator before the people where his views and his relationship to the public interests of the State could be known and understood of all. There is nothing more important in the matter of selecting public officers than of having the candidate take into his confidence those whom he is to represent prior to the time that the certificate of election is issued.

S.Rep. No. 961, 61st Cong., 3d. Sess. 14 (1911) (emphasis added); *see also* 47 Cong. Rec. 1881 (1911) (statement of Sen. McCumber) (coincident with popular election will be nomination by popular vote). Given this history, the court is reluctant to hold that the framers of the Seventeenth Amendment were authorizing major political parties to choose their nominees without an election.

Furthermore, the Court has emphasized the importance of primary elections in other contexts. In cases arising under the First, Fourteenth, and Fifteenth Amendments, the Court has recognized that the Constitution guarantees the franchise at all stages of the electoral process, including the nomination stage. The court will now turn to a discussion of that line of cases.

## C. *A Right to Nominate?*

The Court first announced that nomination procedures are an integral part of the electoral process in *Classic:*

> Where the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice, the right of the elector to have his ballot counted at the primary, is likewise included in the right protected by [the Constitution]. And this right of participation is protected just as is the right to vote at the election, where the primary is by law made an integral part of the election machinery.... Moreover, we cannot

close our eyes to the fact already mentioned that the practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice at the general election even though there is no effective legal prohibition upon rejection at the election of the choice made at the primary and may thus operate to deprive the voter of his constitutional right of choice.

313 U.S. at 318–19, 61 S.Ct. at 1039–40.

■ Thus, the right to vote "must be recognized in any preliminary election that in fact determines the true weight a vote will have." *Gray,* 372 U.S. at 380, 83 S.Ct. at 808 (citing *Classic* and *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944)). For the foregoing reasons, the Court has held that primary elections must comply with all Constitutional provisions applicable to general elections. *See Gray v. Sanders, supra* (one person-one vote rule); *Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927) (equal protection clause); *Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932) (equal protection clause); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, *reh'g denied,* 322 U.S. 769, 64 S.Ct. 1052, 88 L.Ed. 1594 (1944) (Fifteenth Amendment); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152, *reh'g denied,* 345 U.S. 1003, 73 S.Ct. 1128, 97 L.Ed. 1408 (1953) (Fifteenth Amendment); *cf. Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 223, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989) (free discussion about candidates no less protected before primary than before general election).

In *Nixon v. Herndon, Nixon v. Condon, Smith v. Allwright,* and *Terry v. Adams* (the *"White Primary Cases"*), the Court explicitly recognized the importance of voter access to the nomination process.[7] In *Smith,* the Court noted that *Classic* "fus[ed] primary and general elections into a single instrumentality for choice of officers." 321 U.S. at 660, 64 S.Ct. at 763. Therefore, after *Classic,* "it can now be

---

**7.** The *White Primary Cases* established that a state can neither statutorily exclude blacks from primary elections nor delegate the authority to conduct a primary to a private association which discriminates against blacks.

taken as a postulate that the right to vote in such a primary for the nomination of candidates without discrimination by the State, like the right to vote in a general election, is a right secured by the Constitution." 321 U.S. at 661–62, 64 S.Ct. at 763–64.[8]

The Commonwealth's reliance on the statement in *Classic* that "the framers ... did not have specifically in mind the selection and elimination of candidates for Congress by ... direct primary," 313 U.S. at 315–16, 61 S.Ct. at 1037–38, is unavailing. *Classic* immediately qualifies that statement by observing, "in determining whether a provision of the Constitution applies to a new subject matter, it is of little significance that is one with which the framers were not familiar." 313 U.S. at 316, 61 S.Ct. at 1038.

Moreover, *Classic* involved an interpretation of Article I. The framers of the Seventeenth Amendment, unlike the framers of the original Constitution, were quite familiar with the primary system. At the time of the Amendment's passage, many states used the direct primary to choose Senators who were then formally elected by the legislature. *See* 1 G. Haynes, *supra*, at 99–101.

■ The Commonwealth argues that, although the Constitution applies to primaries when they are held, it does not require the states to conduct primaries. The court agrees with the proposition that a state may choose to forego the primary system.

Pennsylvania could choose to have an election without party nominees being selected, by primary or otherwise, before the general election. *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 218, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986) establishes that states may choose to eliminate the nomination process for administrative or financial reasons. However, *Tashjian* does not stand for the proposition that, if the state adopts a system whereby the political parties choose nominees, that system does not have to comply with the Constitution.

Pennsylvania has adopted such a system. The nomination of Democratic and Republican Senatorial candidates is indisputably an integral part of the electoral process. Moreover, it is clear that the choice of political party committees will not always reflect the preferences of party members. Because of the importance of the choice of nominee, precedent requires popular participation at the nomination stage.[9]

*Tashjian* clearly states that popular election mandated by the Seventeenth Amendment applies not only to primaries but to *"the entire process by which federal legislators are chosen* [and t]he constitutional goal of assuring the Members of Congress are chosen by the people can only be secured if that principle is *applicable to every stage in the selection process." Tashjian*, 479 U.S. at 227, 107 S.Ct. at 555 (emphasis added); *cf. Durkin v. National Bank of Olyphant*, 772 F.2d 55, 58 (3d

8. *Classic* and the *White Primary Cases* admittedly arose in states where, at the time, the nomination of the Democratic candidate determined the Congressional representative. *See, e.g., Terry*, 345 U.S. at 469, 73 S.Ct. at 813 (opinion of Black, J.) (general election no more than perfunctory ratifier of the choice made at election from which blacks were excluded); *Classic*, 313 U.S. at 313–14, 61 S.Ct. at 1036–37 (practical operation of Democratic primary in Louisiana was to secure election of Democratic nominee). *Tashjian*, however, clearly applies the same principle to states in which either party could win the election. Thus, the significance of the right to vote in a primary does not hinge on the existence of a "one-party state."

9. A holding that Pennsylvania must conduct a primary to determine the candidates of the Democratic and Republican parties is not incon-

sistent with a state system by which parties with differing levels of support nominate their candidates by different methods. *See American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). The states may take reasonable measures to regulate their electoral processes. The Texas statute attacked in *American Party* provided that each political party that cast at least 200,000 votes for governor in the preceding general election had to nominate by primary. Pursuant to the statute, parties with less support nominated either by convention or by petition. This regulation is reasonably calculated to ensure that any candidate likely to succeed in the general election will have been nominated by a popular vote. Likewise, this holding does not prohibit the political parties from ensuring that nominees running in their primaries have at least minimal support.

Cir.1985) (Higginbotham, J.) (in civic elections, federal law recognizes that access to the candidate selection process is a component of constitutionally mandated voting rights).

Finally, the conclusion that logically follows from *Classic* and the *White Primary Cases* undercuts the Commonwealth's argument that it can allow political parties to choose nominees without complying with the Qualifications Clause. The "place of the primary in the electoral scheme" played a central role in the Court's decisions in earlier cases. *See, e.g., Smith,* 321 U.S. at 660, 64 S.Ct. at 763 (recognizing the unitary character of primary and general elections in electoral process); *see also Terry,* 345 U.S. at 469, 73 S.Ct. at 813 (opinion of Black, J.) (noting that the private Jaybird primary had become the only part of the electoral process in which voters could vote effectively). Primaries are not significant merely because the states choose to use them, but rather because of their function, that is, nominating candidates from the major political parties. Under the Pennsylvania law, the party committees perform the nomination function, and they perform that function undemocratically. "Constitutional rights would be of little value if they could be thus indirectly denied." *Smith,* 321 U.S. at 664, 64 S.Ct. at 765.

**D.** *Constitutional Scrutiny of Pennsylvania's Law*

■ Based upon the foregoing discussion, this court concludes that Pennsylvania's statute infringes upon the right to vote, a fundamental right. Accordingly, the law must be carefully scrutinized. *Eu,* 489 U.S. at 222, 109 S.Ct. at 1019.

■ The political parties, acting pursuant to § 2776, have adopted rules that allow party committee members to vote for a nominee while denying the vote to everyone else.[10] Only the votes of committee members carry any weight in the nomination process. In an apportionment case,

the Court has observed that primary votes must be weighted equally:

> All who participate in the [primary] election are to have an equal vote—whatever their occupation, whatever their income, and whatever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of "the people" under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications.

*Gray,* 372 U.S. at 379–80, 83 S.Ct. at 807–08.

Because the statute allows parties to make distinctions that deny him his right to vote, Trinsey has an equal protection claim as a voter. Trinsey, as a prospective candidate, complains that the law denies him the opportunity to compete in a Republican primary and therefore abridges his First and Fourteenth Amendment rights.

Because Pennsylvania's law burdens the plaintiff's fundamental rights, it can survive constitutional scrutiny only if the Commonwealth shows that it advances a compelling governmental interest and is narrowly tailored to serve that interest. *Eu,* 489 U.S. at 225, 109 S.Ct. at 1021; *Moore,* 394 U.S. at 818, 89 S.Ct. at 1496; *Harper,* 383 U.S. at 667, 86 S.Ct. at 1081 (quoting *Reynolds,* 377 U.S. at 561–62, 84 S.Ct. at 1381–82) ("where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined"); *see also Consumer Party v. Davis,* 633 F.Supp. 877, 890 (E.D.Pa.1986).

In defense of § 2776, Pennsylvania identifies four state interests served by the statute. First, the law limits the number of names on the ballot. Second, it guards against splintered parties and an unstable political system. Third, it prevents clogging the election mechanism. Fourth, it

---

**10.** The *White Primary Cases* establish that when a state delegates authority to political parties to perform public functions, such as nomination of candidates, the actions of the parties are equivalent to state action for the purpose of equal protection analysis. *See also* L. Tribe, *American Constitutional Law* § 13–25, at 1126 (1988).

shortens the length of service of a non-elected Senator.

The states have broad latitude in regulating access to the ballot, see Smith, *Judicial Protection of Ballot–Access Rights: Third Parties Need Not Apply*, 28 Harv.J.Leg. 167 (1991), and the first three interests proffered by the Commonwealth justify regulations that limit ballot access. However, Pennsylvania conducts primaries for regular elections and has not explained why a vacancy primary presents a greater threat to its interests than these normal primary elections. Therefore, the asserted state interests cannot justify a direct infringement of the right to vote secured by the Seventeenth Amendment. Nor can they justify the unequal weight afforded to party committee members' votes at the nomination stage.

Pennsylvania's fourth argument in support of § 2776 is its strongest. A sudden vacancy in Pennsylvania's representation in the Senate admittedly creates exigent circumstances. The concededly valid state interest in shortening the term of the non-elected Senator would be only minimally burdened by the running of a primary election, however.[11] Additionally, Pennsylvania has not narrowly tailored its law to serve the Commonwealth's interest. Allowing political parties to adopt rules conferring the power of nomination on elite members of party committees is a drastic measure. Indeed, only two other states address the exigencies of a Senatorial vacancy with such abandon.[12] The Court has observed that a state carries an extra burden in defending a practice that is exceptional and burdens a fundamental right. See *Eu*, 489 U.S. at 226, 109 S.Ct. at 1022

(noting that California had not explained what made its electoral system so unique that it was virtually the only state to employ a ban on primary endorsements). Pennsylvania has not carried that burden.

■ In conclusion, although Pennsylvania has an interest in limiting the terms of non-elected Senators, it may not achieve its goal by abridging the fundamental rights of its citizens. *Eu*, 489 U.S. at 222, 109 S.Ct. at 1019; *Tashjian*, 479 U.S. at 217, 107 S.Ct. at 549. A state may not, for the sake of expedience, delegate authority over the election process to political parties who then violate the constitutional rights of the citizens of that state. See *Smith*, 321 U.S. at 664, 64 S.Ct. at 765 (constitutional right to be free from racial discrimination in voting not to be nullified by a state through casting of electoral process in a form which permits a private organization to practice discrimination); cf. *Tashjian*, 479 U.S. at 218, 107 S.Ct. at 550 (state cannot restrain party's freedom of association for reasons of administrative convenience). Therefore, unless the vacancy provision of the Seventeenth Amendment authorizes Pennsylvania to address the exigencies of a vacancy without complying with the Constitution, the statute cannot survive constitutional scrutiny.

### E. *The Vacancy Proviso*

■ The Seventeenth Amendment provides that, in case of vacancy, "the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct." One could argue that the final clause, "as the legislature may direct," allows the

---

**11.** For example, in a case such as this one, Pennsylvania could have a fall primary and spring election, thereby extending the appointee's term by only a few months.

**12.** See Colo.Rev.Stat. §§ 1–12–101, 1–4–401, 1–4–402; Mont.Code Ann. § 13–25–202.

Under the same circumstances, eighteen states provide for primary elections. See Ariz.Rev.Stat.Ann. § 16–201; Haw.Rev.Stat. § 17–1; La. Rev.Stat.Ann. §§ 18:1278, 18:402(E); Md.Elec. Code Ann. art. 33, § 21–1; Mass.Ann. Laws ch. 54, § 139; Nev.Rev.Stat.Ann. § 304.010; N.M. Stat.Ann. § 1–15–14; Ohio Rev.Code Ann.

§ 3513.32; S.D. Codified Laws Ann. § 12–11–5; Vt.Stat.Ann. tit. 17, § 2621; Wash.Rev.Code Ann. § 29.68.080; W.Va.Code § 3–10–3; Wis. Stat. § 8.50(4)(b). See Alaska Stat. §§ 15.40.-080, 15.40.090, 15.40.110, 15.40.120; Ind.Code § 3–10–8–7; Or.Rev.Stat. § 188.120; Tex Elec. Code Ann. § 202.004.

· The remaining states make no mention of the nomination process. The court has been unable to find any cases discussing the actual operation of statutes that do not provide for a nomination process.

 

states broad latitude in conducting vacancy elections. In fact, the Commonwealth cites *Valenti v. Rockefeller*, 292 F.Supp. 851 (W.D. & S.D.N.Y.1968), *aff'd*, 393 U.S. 405, 89 S.Ct. 689, 21 L.Ed.2d 635 (1969), *reh'g denied*, 393 U.S. 1124, 89 S.Ct. 989, 22 L.Ed.2d 132 (1969), for the proposition that the Seventeenth Amendment confers "a reasonable discretion upon the States concerning the timing and manner of conducting vacancy elections." 292 F.Supp. at 866.

■ The Amendment, although it confers reasonable discretion upon the states, does not authorize unconstitutional acts by state legislatures. The Amendment very specifically grants the Governor the power to make a temporary appointment, thereby sanctioning an otherwise unconstitutional act. By contrast, the same proviso merely makes a general grant of power to the legislature, without authorizing that branch of government to act outside of constitutional norms. Furthermore, the proviso specifies that "the people" must elect the new Senator.

In sum, this court declines to read a general grant of regulatory power as authorization for the Pennsylvania legislature to avoid the Constitution. Although the Commonwealth has reasonable discretion, that discretion "does not extinguish [its] responsibility to observe the limits established by [the Constitution]." *Eu*, 489 U.S. at 222, 109 S.Ct. at 1019 (citing *Tashjian*, 479 U.S. at 217, 107 S.Ct. at 549)); *Burdick*, 927 F.2d at 472. This is especially true here, since the framers of the Amendment clearly knew how to provide for an otherwise unconstitutional act. By its own language, the Amendment authorizes the Governor to make a temporary appointment. The legislature, however, must provide for popular election of the new Senator. The Amendment does not authorize an election that infringes upon the fundamental right to vote of Pennsylvania's citizens. The statute cannot stand.

**13.** No injunctive relief can be granted against the Democratic and Republican state commit-

## III. CONCLUSIONS OF LAW

1. This court has jurisdiction of this action pursuant to 28 U.S.C. § 1331;

2. The governor's temporary appointment of Senator Wofford is constitutional;

■ 3. The Commonwealth of Pennsylvania has no duty to include the plaintiff as an independent candidate on the November 5, 1991 ballot in the general election unless the plaintiff meets Pennsylvania's requirements for third-party candidates; and

4. Pa.Stat.Ann. § 2776 operates to violate the Seventeenth and Fourteenth Amendment rights of Pennsylvania's voters and is therefore unconstitutional.[13]

## ORDER

AND NOW, upon consideration of the record herein, IT IS ORDERED that

1. the plaintiff's motion for a Temporary Restraining Order to enjoin the appointment of Senator Wofford is DENIED;

2. the plaintiff's motion for a Preliminary Injunction to enjoin the appointment of Senator Wofford is DENIED;

3. the defendants' Motion to Dismiss is DENIED; and

4. the plaintiff's request for a declaratory judgment is GRANTED. This court declares 25 Pa.Cons.Stat.Ann. § 2776 unconstitutional because it operates to abridge the right to vote of the citizens of the Commonwealth of Pennsylvania.

tees because they are not parties to this action.