John F. PERRY and U.S. Taxpayers Party of Pennsylvania, Plaintiffs,

v.

Robert N. GRANT, Acting Secretary of The Commonwealth of Pennsylvania, and William S. Boehm, Commissioner of Bureau of Elections, Defendants.

No. 1:CV–91–1193.

United States District Court, M.D. Pennsylvania.

Oct. 8, 1991.

---

822

James N. Clymer, Lancaster, Pa., for plaintiffs.

Jerome T. Foerster, Deputy Atty. Gen., Office of Atty. Gen., Litigation Section, Harrisburg, Pa., for defendants.

MEMORANDUM

McCLURE, District Judge.

BACKGROUND

Plaintiffs John F. Perry, M.D. and U.S. Taxpayers Party of Pennsylvania ("U.S. Taxpayers")[1] challenge the constitutionali-

---

1. Plaintiffs allege that the U.S. Taxpayers Party of Pennsylvania is "an unincorporated association, formed as a political body as defined in the Pennsylvania Election Code for the purpose of promoting the candidacy of Dr. Perry to the United States Senate." (Plaintiffs' complaint, filed September 12, 1991, para. 3)

The election code distinguishes between political parties and political bodies. Both are defined at 25 P.S. § 2831. A political party is an organization which is entitled to nominate its candidates through primary elections or as otherwise specified by the election code. A political body nominates its candidates through nom-

ty of ballot access requirements imposed on independent party candidates in Senatorial elections by sections 2776 and 2911 [2] of the Pennsylvania Election Code.[3] Perry attempted to qualify for a position on the ballot as a candidate of the U.S. Taxpayers party in the November 5, 1991 special election to fill the unexpired term of former United States Senator John Heinz who died tragically in a mid-air collision on April 4, 1991. Defendants Robert N. Grant, Acting Secretary of the Commonwealth of Pennsylvania and William S. Boehm, Commissioner of the Bureau of Elections, administer Pennsylvania's election code. Grant is the acting chief election officer of Pennsylvania and is charged by law with the responsibility for receiving and accepting

nomination papers for federal and state offices, 25 P.S. § 2621.

Section 2776 governs special elections conducted to fill a vacancy in the office of United States Senator from Pennsylvania [4], and operates in tandem with section 2911 to require independent party candidates seeking a position on a special election ballot to file nomination papers [5] bearing signatures of at least two percent of the qualified electors who voted for the winning candidate in the last state-wide election (the "two-percent rule").[6] The nomination papers must be filed at least sixty days before the election, in this case, on or before September 6, 1991.[7] Nominating papers may be signed by registered voters of any party. 25 P.S. § 2911.

ination papers which must bear the signatures of a specified percentage of voters. *Salera v. Tucker*, 399 F.Supp. 1258, 1260–61 n. 1 (M.D.Pa. 1975) and 25 P.S. § 2831.

Political party status is attained by achieving a certain number of votes in the previous election and is determined in accordance with a mathematical formula set forth in 25 P.S. § 2831(a), (b). Political organizations unable to qualify as parties under this formula are political bodies. *Consumer Party v. Davis*, 778 F.2d 140, 142 (3d Cir.1985).

2. 25 P.S. §§ 2776 and 2911.

3. Federal jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343.

4. Section 2776 provides in its entirety:
Whenever a vacancy shall occur in the office of United States Senator, said vacancy shall be filled for the unexpired term by the vote of the electors of the State at a special election to be held at the time of the next general or municipal election, occurring at least ninety (90) days after the happening of such vacancy, and it shall be the duty of the Governor to issue writs of election to the various county boards of elections and to the Secretary of the Commonwealth within ten (10) days after the happening of said vacancy. Candidates to fill vacancies in the office of United State Senator shall be nominated by political parties, in accordance with the party rules relating to the filling of vacancies, by means of nomination certificates, in the form prescribed in section 630 of this act; and by political bodies, by means of nomination papers in accordance with the provisions of sections 951, 952 and 954 of this act. Said nomination certificates and nomination papers shall be filed in the office of the Secretary of the Commonwealth at least sixty (60) days

prior to the date of said special election. Until such time as said vacancy shall be filled by an election as herein provided, the Governor of the Commonwealth may make a temporary appointment to fill said vacancy.
We are concerned here only with the constitutionality of the two percent requirement.

5. Procedural requirements pertaining to the form and content of the nomination papers which must be filed are set forth at 25 P.S. §§ 2911, 2912 and 2914.

6. Section 2911 provides in relevant part:
(a) In addition to the party nominations made at primaries, nomination of candidates for any public office may also be made by nomination papers signed by qualified electors of the State, or of the electoral district for which the nomination is made, and filed in the manner herein provided. Such nomination papers shall be in form prescribed by the Secretary of the Commonwealth, and no other forms than the ones so prescribed shall be used for such purposes.
(b) Where the nomination is for any office to be filled by the electors of the State at large, the number of qualified electors of the State signing such nomination paper shall be at least equal to two per centum of the largest entire vote cast for any elected candidate in the State at large at the last preceding election at which State-wide candidates were voted for....
25 P.S. § 2911(a) and (b).

7. Candidates of the Republican and Democratic parties are not required to satisfy a signature requirement. Each party is required only to file a nomination certificate at least sixty days before the election stating who its candidate will be.

Under these provisions, Perry was required to file nomination papers bearing the signatures of at least 41,305 qualified electors on or before September 6, 1991. This number was calculated by the Commonwealth and represents two percent of the total number of votes cast for Governor Casey in the 1990 gubernatorial election. Perry failed to obtain the requisite number of signatures,[8] and plaintiffs now challenge the constitutionality of the two-percent rule as a bar to Dr. Perry's inclusion on the November, 1991 special election ballot.

Plaintiffs allege that the two-percent rule violates the First, Fourteenth and Seventeenth Amendments by abridging the rights to freedom of speech and association, due process and equal protection. They contend that the following circumstances render the two-percent rule unconstitutionally burdensome in this case: (1) the brief time allowed for signature-gathering (Perry had from April 9, 1991, the date Governor Casey issued the Writ of Election, to the September 6, 1991 cutoff date to obtain the necessary signatures.); (2) the unusually high number of signatures required due to Governor Casey's having won by an overwhelming majority in 1990; (3) interference with signature-collecting efforts allegedly caused by a stay imposed in June and July 1991 by Judge Cahn, the United States District Judge for the Eastern District of Pennsylvania, in *Trinsey v. Commonwealth of Pennsylvania*, 766 F.Supp. 1338 (E.D.Pa.1991), (Cahn, J.), *rev'd*, 941 F.2d 224 (3d Cir.1991), (Sloviter, J.); and (4) non-applicability of the rule to candidates of the Republican and Democratic parties.

To redress these alleged constitutional violations, plaintiffs seek a declaratory judgment[9] declaring the two-percent rule unconstitutional. They also seek preliminary and permanent injunctions restraining defendants from enforcing the two-percent rule and directing that the signatures and nomination papers filed by plaintiffs be accepted and deemed sufficient to comply with the constitutional intent of the legislature under section 2776. In the alternative, they seek a two-month extension of the pre-election signature-gathering period to allow them time to gather the additional signatures they will require if the two-percent rule is upheld.

Before the court is a Rule 12(b)(6) motion to dismiss plaintiffs' complaint, filed by defendants on September 16, 1991. Cognizant of the need for urgency in view of the impending election, we expedited the briefing schedule and are now in a position to rule on defendants' motion. For the reasons discussed below, we will enter an order dismissing this action.

DISCUSSION

Rule 12(b)(6) motion

■ A complaint may not be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which could entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The court must accept all material allegations in the complaint as true and construe them in the light most favorable to the party opposing the motion. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Johnsrud v. Carter*, 620 F.2d 29 (3d Cir.1980); and *Truhe v. Rupell*, 641 F.Supp. 57, 58 (M.D.Pa.1985) (Rambo, J.). Although the complaint is to be liberally construed in favor of the plaintiff (Fed. R.Civ. 8(f)), the court does not have to accept every allegation as true. Conclusory allegations of law, unsupported conclusions and unwarranted inferences need not be accepted as true. *Conley, supra*, 355 U.S. at 45–46, 78 S.Ct. at 101–02.

---

**8.** There is a factual dispute between the parties as to the total number of signatures Perry can claim. Perry collected a total of 12,500 signatures, but due to a mailing mixup, only 10,800 were received before the September 6, 1991 cutoff date. (Plaintiff's complaint, filed September 12, 1991, para. 19)

This dispute is not material to the issues before us and does not preclude us from ruling on defendant's motion to dismiss.

**9.** 28 U.S.C. §§ 2201 and 2202.

Constitutionality of the two-percent rule

■ Special election procedures are constitutional if they serve a "legitimate" governmental interest. *Trinsey v. Commonwealth of Pennsylvania,* 941 F.2d at 233–34, citing *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 12, 102 S.Ct. 2194, 2201, 72 L.Ed.2d 628 (1982).[10] States may impose reasonable restrictions to limit access to the ballot and control the number of candidates vying for a position in the interest of guarding against splintered parties, preserving the integrity and stability of the political system, preventing unrestrained factionalism, avoiding voter confusion, preventing frivolous or fraudulent candidacies and assuring that the victor is the choice of a majority or at least a strong plurality of voters without incurring the expense and burden of conducting a runoff election. *Bullock v. Carter,* 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972) and *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). Cf. *Williams v. Rhodes,* 393 U.S. 23, 24, 89 S.Ct. 5, 7, 21 L.Ed.2d 24 (1968), (ballot qualifications so onerous as to make it "vir-

tually impossible" for independent parties to qualify violate the Equal Protection Clause). States are not required to make a "particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro v. Socialist Workers Party,* 479 U.S. 189, 194–95, 107 S.Ct. 533, 537, 93 L.Ed.2d 499 (1986). States are not constitutionally required to succumb to pressures by potential candidates for unrestrained or instantaneous ballot access at the expense of endangering such interests. *Storer v. Brown,* 415 U.S. 724, 732–36, 94 S.Ct. 1274, 1280–82, 39 L.Ed.2d 714 (1974) and *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1974).

State legislatures are authorized by the Seventeenth Amendment to fill a vacancy in the state's representation in the United States Senate by popular election.[11] As phrased and interpreted, the Amendment grants reasonable discretion to the legislature to determine the "timing and manner" of vacancy elections and candidate selection procedures. In reviewing the constitution-

**10.** In ballot access cases, the United States Supreme Court has applied varying tests over the past two decades, depending upon the nature of the rights at issue. "Courts and commentators alike have pointed out that the Supreme Court has not been consistent in articulating the standard by which we are to evaluate the constitutionality of such statutes." *Rainbow Coalition v. Oklahoma State Election Board,* 844 F.2d 740, 742 (10th Cir.1988).

In some cases, the Supreme Court has applied a strict scrutiny test; in others, a rational relationship test. (For a list of Supreme Court cases applying one of these tests or some combination of the two, see: *Consumer Party v. Davis,* 633 F.Supp. 877, 885 n. 9 (E.D.Pa.1986).)

More recently, in *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983), the Court applied a "pragmatic multi-factor balancing test" in which it stated that the court must:

first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which

those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Consumer Party, supra,* 633 F.Supp. at 886, quoting *Anderson, supra,* 460 U.S. at 789, 103 S.Ct. at 1570.

In *Trinsey, supra,* 941 F.2d at 233–34, the Third Circuit applied a rational relationship test in determining the constitutionality of the party nomination procedures endorsed by section 2776, so that is the test we apply here.

**11.** The Seventeenth Amendment provides in its entirety:

The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided,* That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies **by election as the legislature may direct.**

(Emphasis supplied.)

ality of such provisions, the courts accord considerable deference to the judgment of the legislature, since it is its function, not the court's, to weigh competing considerations and to adopt the measures it deems most appropriate to serve legitimate governmental interests. *Trinsey, supra,* 941 F.2d at 233 (3d Cir.1991), citing *Valenti v. Rockefeller,* 292 F.Supp. 851, 866 (S.D.N.Y.1968), *aff'd,* 393 U.S. 404, 89 S.Ct. 693, 21 L.Ed.2d 635 (1969).

Special elections conducted under the auspices of section 2776 serve several legitimate governmental interests by: (1) ensuring that such elections are held promptly so as to limit the term of office of an interim Senator who was not elected by popular vote; (2) protecting the integrity of the party system; (3) preventing an overcrowded ballot, e.g. a "laundry list" of names so long that it is confusing to the voter; and (4) promoting an orderly election process. *Storer, supra,* 415 U.S. at 732–33, 94 S.Ct. at 1280 and *Trinsey, supra,* 941 F.2d at 235–36 (implied);[12] and *Andress v. Reed,* 880 F.2d 239, 242 (9th Cir.1989).

In conjunction with these aims, states have a legitimate interest in ensuring the seriousness of candidates for statewide office which they may attain by "requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot." *Jenness, supra,* 403 U.S. at 442, 91 S.Ct. at 1976. See also: *Munro, supra,* 479 U.S. at 193–94, 107 S.Ct. at 536–37. Requiring candidates to demonstrate such support "through the signatures of significant numbers of registered voters", as Pennsylvania has done, is a legitimate means of achieving this end. *Andress, supra,* 880 F.2d at 242.

Plaintiffs protest that Pennsylvania's two-percent rule is a denial of equal protection, because party candidates are not required to make a like showing of voter support. This argument overlooks the fact that a signature requirement for party candidates would be superfluous. Party candidates are affiliated with a political party, which, by definition,[13] has demonstrated a certain level of voter support. Requiring parties to re-prove their support each time they sponsor a candidate would serve no purpose. *Williams v. Tucker,* 382 F.Supp. 381, 384–86 (M.D.Pa.1974) and *Trinsey, supra.*

Two percent is not an inherently unreasonable or unduly burdensome signature requirement. Other ballot access signature rules imposing equally rigorous or more rigorous requirements have been upheld by the Supreme Court. In *Jenness, supra,* the United States Supreme Court upheld Georgia's requirement that independent candidates file a nominating petition signed by at least five percent of the number of registered voters in the last general election for the office in question. In *Storer, supra,* 415 U.S. at 738–40, 94 S.Ct. at 1283–84, the Supreme Court held that California's five-percent signature requirement, which required potential candidates to gather 325,000 signatures over a twenty-four day period, was constitutional so long as there was an adequate number of eligible voters from which to obtain the necessary signatures.[14]

Perry had 149 days (calculated from April 9, 1991 to September 5, 1991, the day prior to the filing deadline) to gather 41,305 signatures. This required him to average 277 signatures a day, which is in keeping with signature requirements upheld in other states. See e.g., *Andress, supra,* (California statute requiring Democratic candi-

---

**12.** The issue before the court in *Trinsey* was the constitutionality of party nomination procedures in special elections. Under section 2776, parties do not hold a primary election to select their candidate for the general election. Candidates are selected by nomination. The court held this procedure constitutional under the Fourteenth and Seventeenth Amendments, but the constitutionality of the two-percent rule was not before it.

**13.** 25 P.S. § 2831.

**14.** For a list of decisions upholding the constitutionality of various percentage signature requirements, see: *Storer, supra,* 415 U.S. at 740 n. 10, 94 S.Ct. at 1284 n. 10.

date for United State Senate to collect 10,-000 signatures within forty-five days as an alternative to paying a filing fee held reasonable and constitutional.); *Cross v. Fong Eu*, 430 F.Supp. 1036, 1040 (N.D.Cal.1977) (Requirement that an independent candidate obtain "roughly 100,000 signatures in a two-month period" held constitutional) and *Williams, supra*, 382 F.Supp. at 386 (Constitutional to require an independent candidate to obtain 2,452 signatures in twenty-one days from an available pool of over 250,000 qualified voters.)

Moreover, the constitutionality of Pennsylvania's two-percent rule has been upheld against First, Fourteenth and Seventeenth Amendment challenges in several Pennsylvania district court decisions. In the two most recent, *White v. Commonwealth of Pennsylvania*, No. 91–1059 (W.D.Pa. Sept. 23, 1991), (Mencer, J.) and *Sagen v. Commonwealth of Pennsylvania*, No. 91–1409 (W.D.Pa. August 30, 1991) (Diamond, J.), independent party candidates seeking a position on the November, 1991 special election ballot challenged the constitutionality of the 41,305 signature requirement on equal protection and other grounds. Both courts dismissed plaintiffs' complaints on Rule 12(b)(6) motions based on precedents upholding the constitutionality of reasonable ballot access requirements and specifically upholding the constitutionality of section 2776.[15]

The November 1991 special election is not the first election to prompt a constitutional challenge to the two-percent rule. In *Salera v. Tucker*, 399 F.Supp. 1258 (E.D.Pa.1975), (Adams, J., Huyett, J., and Newcomer, J.), *aff'd per curiam*, 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976) a three judge panel held that the two-percent rule is constitutional.[16] A different three judge panel reached the same conclusion in *Williams, supra*, 382 F.Supp. at 384–86 (Rosenn, J., Sheridan, J., and Nealon, J.).

■ Against this massive weight of authority upholding signature requirements similar to Pennsylvania's two-percent rule, plaintiffs' arguments that we should strike down the requirement are unpersuasive. Plaintiffs argue that we should measure the reasonableness of Pennsylvania's two-percent signature requirement against the requirements imposed by neighboring states. They point out that New Jersey, New York and Ohio all have less demanding ballot access requirements for independent candidates.[17] Plaintiff's argument misses the point. It is not the courts' function to weigh the procedure chosen by the state legislature against the feasibility of less burdensome alternatives it could have chosen. The court's sole task is to determine the reasonableness of the procedure chosen as a means of achieving a legitimate governmental end. *Trinsey, supra*, 941 F.2d at 233–34. The fact that other state legislatures have chosen to impose less burdensome requirements on independent candidates is irrelevant.

■ Plaintiffs further argue that the two-percent rule is unreasonably burdensome as applied in this context, since the overwhelming victory by Governor Casey in the 1990 gubernatorial election requires them to produce a large number of votes to gain access to the November, 1991 ballot. Plaintiffs are really challenging the legislature's decision to tie the number of signatures required to the number of votes garnered by the victor of the last state-wide election. Contrary to plaintiff's contention, a percentage of that number is a reason-

---

**15.** Both decisions have been appealed to the Court of Appeals for the Third Circuit.

**16.** The *Salera* court ruled 25 P.S. § 2913(b) and (c) unconstitutional on other grounds. Those provisions required independents seeking to run in the primary to collect the necessary elector signatures over a three-week period beginning the tenth Wednesday before the primary and ending the seventh Wednesday prior to the primary. *Salera, supra*, 399 F.Supp. 1258, 1261, 1265–69.

**17.** Plaintiffs raise this argument in their brief, but do not plead the facts upon which it is based. Since we are deciding this case on a Rule 12(b)(6) motion, we should not consider any facts not alleged in the pleadings. However, in the interest of completeness we will consider plaintiffs' argument on this issue and assume the facts upon they base it to have been properly pled.

able gauge of the number of votes a candidate will be required to garner if he is to be a serious senatorial candidate, and the fact that the total number of signatures required fluctuates with election results does not render it unconstitutional. *Rainbow Coalition v. Oklahoma State Election Board, supra,* 844 F.2d at 744.

## Injunctive relief

Plaintiffs have not filed a motion for injunctive relief, so in a technical sense, their entitlement to such relief is not properly before the court at this time. No hearing has been held on this issue, and we have no factual record on which to decide such issues. See: Fed.R.Civ.P. 65. However, in view of our ruling dismissing the complaint, we believe we are obliged to consider plaintiffs' possible entitlement to the injunctive relief requested in the complaint.

Plaintiffs seek preliminary and permanent injunctions restraining defendants from enforcing the two-percent rule as unconstitutional. In the alternative, they seek a two-month extension to gather additional signatures.

The first request can be summarily disposed of, since we have found the two-percent rule constitutional. The second requires further discussion.

■ To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of immediate and irreparable harm to the movant if an injunction does not issue; (2) no likelihood of harm to "parties interested in the proceedings" if the injunction does issue; (3) no adverse impact on the public interest if the injunction is granted; and (4) a likelihood of success on the merits. *Fink v. Supreme Court of Pennsylvania,* 646 F.Supp. 569, 570 (M.D.Pa.1986), citing *Pennsylvania v. United States Department of Agriculture,* 469 F.2d 1387, 1388 (3d Cir.1972).

■ Plaintiffs argue that injunctive relief is appropriate because they were effectively deprived of their signature-gathering ability during the two-month period Judge Cahn's June 10, 1991 order was in effect.[18] (The order was reversed by order of the Third Circuit on August 6, 1991.) Plaintiffs argue that Judge Cahn's order operated, in effect, as a temporary stay of the election and encouraged them to assume that the election would be delayed, because conducting a primary election, which Judge Cahn held to be constitutionally required, would have inevitably delayed the special election. In support of this argument, plaintiffs point to the fact that the Republican party apparently placed its nomination on hold pending an appellate ruling on the constitutionality of section 2776.

Judge Cahn's ruling did not bar plaintiffs from continuing their signature-gathering activities. Contrary to plaintiffs' allegations, Judge Cahn did not stay the election.[19]

Moreover, plaintiffs' knowledge that the ruling was being challenged before the appellate courts in an expedited appeal undeniably put them on notice that there was a possibility that the ruling would be overturned and that the election would be held as scheduled with all filing deadlines in place. Under the circumstances, plaintiffs'

---

**18.** Plaintiff's complaint, filed September 12, 1991, para. 15.

**19.** Although in ruling on a motion to dismiss, the court must accept all well-pleaded facts as true, it is not required to accord the same treatment to conclusory allegations of law, unsupported conclusions or unwarranted inferences. *Conley, supra,* 355 U.S. at 45–46, 78 S.Ct. at 101–02.

Plaintiffs' allegation that the election was stayed is an unwarranted inference from Judge Cahn's June 10, 1991 order, which plaintiffs attached to their opposing brief. The order states, in its entirety:

1. the plaintiff's motion for a Temporary Restraining Order to enjoin the appointment of Senator Wofford is DENIED;
2. the plaintiff's motion for a Preliminary Injunction to enjoin the appointment of Senator Wofford is DENIED;
3. the defendant's motion to Dismiss is DENIED; and
4. the plaintiff's request for a declaratory judgment is GRANTED. This court declares 25 Pa.Cons.Stat.Ann. § 2776 unconstitutional because it operates to abridge the right to vote of the citizens of the Commonwealth of Pennsylvania.

signature-collecting efforts should have continued unabated. If they did not, the fault lies with plaintiffs, not with the system or with a court ruling.

Plaintiffs' second argument is related to the first. They argue that because party nominations were held in abeyance during the pendency of the Trinsey appeal, plaintiffs were "denied the opportunity to collect ... signatures while presenting their candidate and issues after the Republicans had formally decided on their candidate." Plaintiffs do not have a constitutional entitlement to gather signatures for the nominating papers after the nomination of party candidates. Although there is authority which suggests that early filing deadlines for independents "significantly burden" the "fundamental rights to vote effectively and to associate" by preventing new parties from "seeking support at a time when such support is most likely to crystallize—after the established parties have put forth their candidates and platforms," federal courts have held that such considerations have limited significance in view of the Supreme Court's approval of filing deadlines on dates preceding the major party conventions. *Rainbow Coalition, supra,* 844 F.2d at 744 and 746, citing *American Party v. White,* 415 U.S. 767, 787 n. 14, 94 S.Ct. 1296, 1309 n. 14, 39 L.Ed.2d 744 (1974) and *Jenness, supra,* 403 U.S. at 434, 91 S.Ct. at 1972.[20] Cf. *Salera, supra,* 399 F.Supp. at 1266–69 (District court ruled unconstitutional requirement that all independents' nomination papers be filed no later than the seventh Wednesday prior to the primary (218 days prior to the general election) based, *inter alia,* on plaintiff's argument that it forces such candidates to

"gather signatures before the issues of the upcoming election have been defined" and "forces them to complete their signature gathering process in a political vacuum, seven weeks before the major parties choose their candidates")

Plaintiffs have presented no convincing arguments indicating that they are entitled to an injunction extending the filing deadline.

---

**20.** The Supreme Court gave dispositive weight to such considerations in *Anderson, supra,* 460 U.S. at 790–92, 103 S.Ct. at 1570–71, but ruled as it did based on other considerations not present in a senatorial election. Anderson was an independent candidate for the presidency in 1980, and challenged Illinois' filing deadline which kept him off of the ballot in that state. In striking down the deadline, the Supreme Court noted the distinctions between national and state elections, stating:

in the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest..... Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders. Similarly, the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.

*Anderson, supra,* 460 U.S. at 794–95, 103 S.Ct. at 1573.