The **PATRIOT PARTY OF PENNSYLVANIA and Robert B. Surrick**

v.

Brenda **MITCHELL,** Secretary of the Commonwealth of Pennsylvania; William P. **BOEHM,** Commissioner of the Bureau of Commissions, Elections, and Legislation.

No. 93–2257.

United States District Court, E.D. Pennsylvania.

June 29, 1993.

As Amended Aug. 30, 1993.

---

Kenneth William Richmond, Rosengarten & Richmond, Philadelphia, PA, Donald B. McCoy, Holland, PA, Jay Bagdis, Blue Bell, PA, George L. Kelley, Philadelphia, PA, for plaintiffs.

Kate L. Mershimer, Office of Atty. Gen., Harrisburg, PA, for defendants.

## OPINION

CAHN, Chief Judge.

This is a case that focuses on the tension between the requirements of a state's ballot access laws and the constitutional rights of a minor political party and its candidates. The state legislature, which enacts the ballot access laws, is comprised primarily of major party politicians. The tension exists because these laws may become so restrictive and burdensome that they impinge upon a minor party's or candidate's rights under the Equal Protection Clause and/or the First Amendment.

The Patriot Party of Pennsylvania ["Patriot Party"] and Robert B. Surrick ["Surrick"], the plaintiffs, filed this civil rights suit under 42 U.S.C. § 1983 to (1) challenge the constitutionality of two of Pennsylvania's ballot access provisions, which are codified at 25 Pa.Stat.Ann. § 2872.2, and 25 Pa.Stat.Ann. § 2911(b), respectively [1]; and (2) have Surrick's name placed on the ballot for the general election to be held on November 3, 1993 for the office of Justice of the Supreme Court

---

1. The plaintiffs' amended complaint challenges only the constitutionality of § 2872.2 on a theory of equal protection. At the hearing and in their post-hearing briefs the plaintiffs argued that their case also included a challenge to the constitutionality of § 2911. The plaintiffs also urged that their claims are supported by the First and Fourteenth Amendments in addition to equal protection. The defendants did not object to these other issues, and therefore this court will consider them. *See* Fed.R.Civ.P. 15(b), which in pertinent part provides that "[w]hen issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated as though they were raised in the pleadings."

of Pennsylvania. Initially, the plaintiffs sought a preliminary injunction. At the hearing, however, the parties agreed not to pursue preliminary injunctive relief, and instead proceeded with a final hearing on the merits. In addition to the evidence adduced at the hearing, the parties have submitted post-hearing briefs.[2]

I make the following:

## I. FINDINGS OF FACT

### 1. PENNSYLVANIA'S STATUTORY SCHEME

Pennsylvania's statutory scheme, which is known as the Pennsylvania Election Code ["Election Code"], is codified at 25 Pa.Stat. Ann. §§ 2600–3573. Under the code, a political group is classified as either: 1) a political body, *see* 25 Pa.Stat.Ann. § 2911; or 2) a political party. The criterion that differentiates a political body from a political party is set forth in 25 Pa.Stat.Ann. § 2831. Specifically, if the political group's candidates received less than 2% of the largest vote cast in the most recent general election, the group is classified as a political body. If they receive 2% (or more), it is classified as a political party. There are also two classes of political parties. A political party is categorized as either 1) a major political party; or 2) a minor political party. A political party is "major" if it consists of 15% (or more) of the total registered voters in the Commonwealth. A political party is "minor" if its enrollment is less than 15% of the registered voters in the Commonwealth.[3]

Access to the ballot in the general election for a political group's candidate depends upon its classification. A major political party uses the primary election to determine who will represent it in the general election. To gain access to the primary ballot, a member of the party must obtain signatures on forms known as nomination *petitions.* The number of signatures required depends upon the office that the candidate seeks. *See* 25 Pa.Stat.Ann. § 2872.1. For example, a member of a major party who seeks the office of President of the United States or Governor of Pennsylvania must obtain two thousand signatures. A member of a major party who seeks the office of Justice of the Pennsylvania Supreme Court must procure one thousand signatures.[4] The candidate who receives a plurality of votes of the major party electors in the primary shall be the candidate for that major party at the general election. *See* 25 Pa.Stat.Ann. § 2882.

Minor political parties and political bodies, on the other hand, do not use the primary process. Instead, access to the general election ballot for members of those entities is governed by 25 Pa.Stat.Ann. § 2911. Although § 2911 is titled "Nominations by political bodies," it also governs the procedures to be used by minor political parties. 25 Pa.Stat.Ann. § 2872.2 specifically provides that "minor political parties shall nominate all of their candidates for the offices to be filled at the ensuing November election ... in accordance with the requirements of [§ 2911]...." Under § 2911(a) a candidate may gain access to the general election ballot if the candidate obtains the requisite number of signatures on documents known as nomination *papers.* Section 2911(b) designates the requisite number to be "at least equal to two per centum of the largest entire vote cast for any elected candidate in the State at large at the last preceding election at which Statewide candidates were voted for."

The time at which nomination papers may be circulated is governed by 25 Pa.Stat.Ann. § 2913(b). It provides in pertinent part that "[n]o nomination paper shall be circulated

---

**2.** The defendants also question the propriety of each plaintiff submitting a post-hearing brief. *See* Defendant's Reply Brief at p. 2 n. 3. This court views this practice to be neither "highly unusual" nor "improper."

**3.** In pertinent part, § 2872.2(a) states that " 'Minor Political Party' shall mean a political party ... whose State-wide registration is less than fifteen per centum of the combined State-wide registration for all State-wide political parties as

of the close of the registration period immediately preceding the most recent November election."

**4.** In addition to the total number of signatures required for candidates for the Pennsylvania Supreme Court, § 2872.1(8) also requires candidates to obtain "at least one hundred signatures from each of at least five counties."

prior to the tenth Wednesday prior to the primary, and no signature shall be counted unless it bears a date affixed no earlier than the tenth Wednesday prior to the primary...." The period to obtain signatures generally continues up to and including August 1st of the year of the election. This date is not derived by a section found in a section of the Election Code. Instead, it comes from the case *Hall v. Davis,* Civ. No. 84–1057 (E.D.Pa.1984), where Judge Bechtle approved a consent decree signed by, among others, the Secretary of the Commonwealth. The consent decree states that the Commonwealth would accept nominating papers "filed on or before August 1 of this year and future election years...." Since August 1, 1993, falls on a Sunday the nominating paper deadline for the upcoming election is August 2, 1993.

2. On January 7, 1993, defendant Brenda Mitchell, Secretary of the Commonwealth of Pennsylvania, informed the County Boards of Elections that Pennsylvanians for Perot was a certified political party in the Commonwealth of Pennsylvania because 902,667 Pennsylvanians voted for Ross Perot in the 1992 Presidential Election. Additionally, defendant William P. Boehm, Commissioner of the Bureau of Commissions, Elections and Legislation notified the County Election Contact Persons that the Pennsylvanians for Perot Party could not nominate candidates for office in the primary election because its voter registration was less than 15% of the combined statewide registration.

3. In accordance with Ross Perot's wishes not to have his name used in connection with any political party, Pennsylvanians for Perot changed its name to the New Patriot Party.

4. On January 23, 1993, the New Patriot Party of Pennsylvania changed its name to the Patriot Party of Pennsylvania.

5. The Patriot Party has approximately one thousand one hundred party members.

6. The Patriot Party is a minor political party as that term is defined in 25 Pa.Stat. Ann. § 2872.2(a).

7. Plaintiff Surrick is currently an attorney, who has been licensed to practice law in the Commonwealth of Pennsylvania since 1961. In addition to his private practice, Surrick has periodically served in the public sector. He has been a municipal solicitor for numerous municipalities on a full-time basis and as special counsel. He has also served as a Special Assistant Attorney General and as a member of the Judicial Inquiry and Review Board.

8. Surrick has long been an avid supporter of judicial reform and has submitted to every member of the Pennsylvania Legislature a pamphlet that he compiled in January of 1993. On two occasions Surrick has testified before the Pennsylvania House Judiciary Committee regarding judicial reform.

9. In 1989, Surrick attempted to secure a spot on the general election ballot as an independent candidate for Justice of the Supreme Court of Pennsylvania. This attempt failed because Surrick was unable to procure the number of signatures required under the Election Code of Pennsylvania.

10. Surrick is now a member of the Patriot Party, and at a convention held on March 1, 1993, the Patriot Party unanimously nominated him to be its nominee for Justice of the Supreme Court of Pennsylvania.

11. Surrick, as a candidate of a minor political party, will be placed on the general election ballot if he obtains the number of signatures on nominating papers as required by 25 Pa.Stat.Ann. § 2911(b).

12. State treasurer Catherine Baker Knoll received more votes, 2,832,031, than any other candidate at the last general election.

13. Two per centum of 2,832,031 is 56,641, which is the number of signatures that Surrick must receive in order to appear on the ballot.

14. The highest number of votes received and two per centum of that figure for the past fourteen years is as follows:

| YEAR | HIGHEST VOTE | SIGNATURES REQUIRED |
|---|---|---|
| 1978 | 1,966,042 | 39,321 |
| 1979 | 1,234,045 | 24,681 |
| 1980 | 2,261,872 | 45,237 |
| 1981 | 1,121,090 | 22,421 |
| 1982 | 1,872,784 | 37,456 |
| 1983 | 1,379,975 | 27,599 |
| 1984 | —— | —— |
| 1985 | 1,059,489 | 21,190 |
| 1986 | 1,906,387 | 38,128 |
| 1987 | 1,278,377 | 25,568 |
| 1988 | 2,300,087 | 46,002 |
| 1989 | 1,242,867 | 24,857 |
| 1990 | 2,065,244 | 41,305 |
| 1991 | 1,458,594 | 29,172 |
| 1992 | 2,832,031 | 56,641 |

15. For 1993, the first day nomination papers could be circulated was March 10, 1993.[5]

16. For 1993, nomination papers may be circulated up to and including August 2, 1993.

17. The Patriot Party notified the Commonwealth of Pennsylvania before March 10, 1993, that it needed nomination papers for Surrick.

18. The nomination papers were first provided by the Commonwealth of Pennsylvania to the Patriot Party on April 9, 1993.

## II. DISCUSSION

The plaintiffs invite this court to invalidate portions of the Election Code for a variety of reasons. First, they argue that under a theory of "retention" the Patriot Party should not be required to meet continually the signature requirement imposed by § 2872.2 and § 2911. Second, they contend that the requirement that an organization obtain 15% of the registered voters in order to become a major political party is unconstitutional. Third, they contend that the 2% signature requirement for political bodies and minor political parties does not further Pennsylvania's state interests. Finally, they contend that the totality of the legislative scheme operates to bar impermissibly the Patriot Party from the ballot. Before reaching these claims this court will discuss the abstention doctrine, and the standard of review that courts must use in ballot access cases.

## A) ABSTENTION

■ Defendant William P. Boehm's letter dated January 7, 1993, see Plaintiffs' Exhibit 3, makes it clear that in the Commonwealth's view there is one and only one way for a minor political party to get on to the general election ballot—by obtaining the requisite number of signatures on the nominating papers. At the hearing, the issue of abstention surfaced when one of the plaintiffs' witnesses, Nicholas R. Sabatine, testified that § 2911 could be interpreted differently than the Commonwealth's interpretation. Sabatine opined that under § 2911 access to the ballot may be had via two separate avenues: 1) by nominating papers; or 2) by primaries. Transcript at pp. 25–26. This court suggested that abstention might be appropriate because, assuming Sabatine's opinion to be true, the issue should be resolved by the state courts. Transcript at p. 129. Accordingly, the parties were instructed to address

5. 25 Pa.Stat.Ann. § 2913(b) governs the timing for the circulation of nominating papers. It provides in pertinent part that "[n]o nomination paper shall be circulated prior to the tenth Wednesday prior to the primary, and no signature shall be counted unless it bears a date affixed no earlier than the tenth Wednesday prior to the primary...." The primary took place on May 18, 1993.

the appropriateness of abstention in their post-hearing briefs.[6]

In general, a federal district court should not abstain, because the obligation to adjudicate claims within its jurisdiction is "virtually unflagging." *Gwynedd Properties, Inc. v. Lower Gwynedd Township*, 970 F.2d 1195, 1199 (3d Cir.1992) (quoting *New Orleans Public Service*, 491 U.S. at 359, 109 S.Ct. at 2513). Nevertheless, "abstention is appropriate in a few carefully defined situations." *Gwynedd Properties*, 970 F.2d at 1199 (citation omitted). A court may abstain under the *Pullman* doctrine "only if the state law at issue 'is fairly subject to an interpretation which will render unnecessary' a ruling on a federal constitutional issue." *Armstrong World Industries v. Adams, Inc.*, 961 F.2d 405 (3d Cir.1992). In *Chez Sez III Corporation v. Township of Union*, 945 F.2d 628 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992), the Third Circuit Court of Appeals applied a tripartite test to determine whether *Pullman* abstention is appropriate. In order to abstain, the district court must find that there are:

(1) Uncertain issues of state law underlying the federal constitutional claims brought in federal court;

(2) State law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of adjudication of the constitutional claims; and

(3) A federal court's erroneous construction of state law would be disruptive of important state policies.

*Chez Sez III*, 945 F.2d at 631 (citation omitted).

In this case, the plaintiffs have apparently forsaken their "multi-interpretation" argument because their post-hearing memorandum specifically states that "[i]n the present case, the legislative requirements are not susceptible to a state court interpretation that departs from the plain meaning of the statutory language." Plaintiffs' Memorandum in Support of Injunctive and Declaratory Relief ["Plaintiffs' Post–Hearing Memo"] at p. 6. The plaintiffs' change of direction is appropriate because the statutory language is neither unsettled nor ambiguous.

The basis of Sabatine's dual interpretation is the first sentence of § 2911(a). It reads "[i]n addition to the party nominations made at primaries, nomination of candidates for any public office may also be made by nomination papers signed by qualified electors of the State, ... and filed in the manner herein provided." This provision alone does not support the inference that minor political parties may utilize the primaries to obtain ballot access for its candidates. This is especially true when read in conjunction with § 2872.2(a), the section that defines minor political parties. Section 2872.2(a) states that minor political parties "shall nominate all of their candidates ... in accordance with the requirements of § 2911...." It does *not* refer to any of the sections that govern the ballot access procedures for major political parties. Furthermore, § 2872.2 plainly states that minor political parties "*shall* obtain the required signatures during the same time frame available to political bodies." (emphasis added). Therefore, Sabatine's in-

---

**6.** Although *Burford* abstention, a doctrine originally enunciated by the Supreme Court in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), was mentioned at the hearing, abstention, if applicable at all, would be appropriate only under the doctrine of *Pullman* abstention, which was articulated in *Railroad Commission of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). A district court may abstain under *Burford* "[w]here [its] exercise of jurisdiction would interfere with ongoing proceedings pursuant to a state regulatory scheme...." *General Glass Industries Corporation v. Monsour Medical Foundation*, 973 F.2d 197, 201 (3d Cir.1992). Thus *Burford* abstention is appropriate

(1) when there are 'difficult questions of state law bearing upon public problems of substantial import whose importance transcends the results in the case at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'

*General Glass*, 973 F.2d at 201 (quoting *New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989). Since Pennsylvania's regulatory processes are not at issue here, *Burford* abstention is inappropriate.

terpretation of the statute lacks any logical basis. If the Pennsylvania legislature wanted both avenues to be available to minor political parties, then it would have specifically mentioned both in § 2872.2(a). Since the first prong of the *Pullman* test has not been satisfied, this court will not abstain.

## B) STANDARD OF REVIEW

■ Over the past twenty five years the United States Supreme Court has addressed the issue of ballot access on numerous occasions. These cases have involved claims premised on the Equal Protection Clause, the First Amendment, or both. What has emerged from these cases is the "constitutional right of citizens to create and develop new political parties," *Norman v. Reed,* —— U.S. ——, ——, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992), and the right of individuals to cast their votes effectively. *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). By the same token, it is equally apparent that states may regulate the number of candidates that will appear on the ballot. *See American Party of Texas v. White,* 415 U.S. 767, 782 n. 14, 94 S.Ct. 1296, 1307 n. 14, 39 L.Ed.2d 744 (1974). States have accommodated these competing goals by requiring political organizations to make "some preliminary showing of a *significant modicum of support* before printing the name of a ... candidate on the ballot." *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971) (emphasis added).

Until recently, however, the standard of review to be utilized in ballot access cases was not settled. Some of the cases have been decided with standards that are tantamount to strict scrutiny. For example in *Williams,* the Supreme Court held that "in determining whether the State has power to place such unequal burdens on minority groups ... this Court [has] consistently held that 'only a compelling state interest in the regulation ... can justify limiting First Amendment freedoms.' " *Williams,* 393 U.S. at 31, 89 S.Ct. at 11 (citation omitted). The Court used a similar standard in *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). In that case, the Court held that "when a [state's ballot access laws limit the choices available to voters] the State must establish that its classification is necessary to serve a compelling interest." *Illinois State Election Board,* 440 U.S. at 184, 99 S.Ct. at 990.

Other decisions of the Court have used a less stringent standard. In *Jenness,* the Court upheld a Georgia statute because it furthered an "important state interest." *Jenness,* 403 U.S. at 442, 91 S.Ct. at 1976. Additionally, in *American Party of Texas,* the Court determined that the requirements of the statute at issue were "reasonably taken in pursuit of vital state objectives that cannot be served equally well in significantly less burdensome ways." *American Party of Texas,* 415 U.S. at 781, 94 S.Ct. at 1306.

■ The Supreme Court ultimately concluded that ballot access laws could not be subjected to "any litmus-paper test that will separate valid from invalid restrictions." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974). Subsequent Supreme Court decisions have continually reaffirmed this principle. *See Burson v. Freeman,* —— U.S. ——, ——, 112 S.Ct. 1846, 1857, 119 L.Ed.2d 5 (1992); *Munro v. Socialist Workers Party,* 479 U.S. 189, 193, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986); *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983); *Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982). *See also Burdick v. Takushi,* —— U.S. ——, ——, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (holding that the application of strict scrutiny to every voting regulation "would tie the hands of States seeking to assure that elections are operated equitably and efficiently"). Since the Court could not derive a mechanistic formula to determine whether ballot access laws passed constitutional muster, it developed an analytical framework for federal courts to use. This approach was articulated in *Anderson, supra.*

[A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and

Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the state as justifications for the burden imposed by the rule. In passing judgment, the court must not only determine the legitimacy and strength of each of those interests; it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is constitutional.

*Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570 (quoted in *Burdick*, —— U.S. at ——, 112 S.Ct. at 2063; *Valenti v. Mitchell*, 962 F.2d 288, 299 (3d Cir.1992)). This formulation makes the severity of the access law directly proportional to the degree of scrutiny it will receive by a court.[7] *See, e.g., Norman*, —— U.S. at ——, 112 S.Ct. at 705, (observing that simply thwarting a party's access to the ballot requires the state to show a "sufficiently weighty" interest, while severely restricting it requires the state to advance an interest of "compelling importance"). *See also, Clements*, 457 U.S. at 964, 102 S.Ct. at 2844 (concluding that "[d]ecision in this area of constitutional adjudication is a matter of degree"). In applying this formula to equal protection claims,[8] the court must therefore recognize that "only those classifications which are invidious, arbitrary, or irrational offend ... the Constitution." *Clements*, 457 U.S. at 967, 102 S.Ct. at 2845.

## C) THE PLAINTIFFS' ARGUMENTS

### 1) RETENTION

The essence of the Patriot Party's and Surrick's retention theory is that once a po-

litical party demonstrates that it has received a modicum of support, it should not have to re-establish repeatedly that support in order to gain access to the ballot in subsequent elections. *See* Transcript at p. 5; Plaintiffs' Post–Hearing Memo at p. 6. The plaintiffs contend that they have satisfied the "significant modicum of support" threshold on two separate occasions: 1) when they obtained the requisite number of signatures to get Ross Perot onto the presidential ballot in Pennsylvania; and 2) when Ross Perot received over 18% of the votes cast in Pennsylvania during the presidential election. The plaintiffs argue that a requirement of further support is "redundant and unnecessary." Plaintiffs' Post–Hearing Memo at p. 6.

The plaintiffs attempt to buttress their position with *Illinois State Board of Elections* and *Norman, supra.* They read the *Illinois State Board of Elections* decision to hold that an Illinois statute, which required statewide candidates to obtain 25,000 signatures and local candidates to obtain signatures totaling 5% of those who voted in the most recent election, was unconstitutional because it was redundant. Plaintiffs' Post–Hearing Memo at p. 7. Furthermore, they assert that in *Norman* the Court declared another Illinois statute unconstitutional because requiring the political party to obtain 50,000 signatures burdened the party and served no state interest. Plaintiffs' Post–Hearing Memo at p. 7. Finally, the plaintiffs contend that other ballot access cases decided by the Supreme Court are inapposite because they all involved situations where the political party had not previously demonstrated a significant modicum of support. Plaintiffs' Post–Hearing Memo at p. 7.

---

**7.** This framework is applicable regardless whether the plaintiff is a political party or an individual who aspires to hold public office. In *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), the Supreme Court held that laws that impede an individual candidate's access to the ballot generally do not compel close scrutiny. *Bullock*, 405 U.S. at 143, 92 S.Ct. at 856. Nevertheless, a restriction on candidate access will be subject to a heightened standard if the law begins to affect people's right to vote. *Bullock*, 405 U.S. at 144, 92 S.Ct. at 856. Thus, insofar as the Election Code impinges on voters, the standard of review is similar that used for minor political parties; if there is no material effect on voters

than the standard for upholding the law is less rigorous.

**8.** Although the balancing approach articulated in *Anderson* did not specifically address causes of action premised on the Equal Protection Clause, the Court did rely on prior cases that were decided on Equal Protection grounds. *See Norman*, —— U.S. at —— n. 8, 112 S.Ct. at 705 n. 8 (citing *Anderson*, 460 U.S. at 786–87, n. 7, 103 S.Ct. at 1569, n. 7). Thus, it is appropriate to use this for Equal Protection cases as well as First Amendment cases.

This court finds the plaintiffs' argument to be unpersuasive. First, the authority cited by the Patriot Party does not support the proposition that a political party should not have to re-establish a significant modicum of support in subsequent elections after it has met that burden once. In *Illinois State Board of Elections*, the Court did not find a constitutional transgression because the election law requirement was redundant.[9] The election law was found to be unconstitutional not on any retention theory, but because the statute required candidates of new political parties to collect more signatures to get on the general election ballot for local offices than they had to for statewide positions. *Illinois State Board of Elections*, 440 U.S. at 186–87, 99 S.Ct. at 991–92. Similarly, in *Norman* the Court found a problem with the application of a signature requirement rather than a flaw with the statute's requirement that a party obtain them. In *Norman*, the statute at issue required candidates of a new political party to collect 25,000 signatures to get on the ballot for a statewide office. *Norman*, —— U.S. at ——, 112 S.Ct. at 702. Additionally, candidates for offices within a political subdivision had to get 25,000 signatures from each district within the political subdivision. *Norman*, —— U.S. at ——, 112 S.Ct. at 702. The Court struck down this requirement for the same reasons it articulated in *Illinois State Board of Elections*. *Norman*, —— U.S. at ——, 112 S.Ct. at 707 (holding that the "Illinois law retains the constitutional flaw at issue in *Socialist Workers* by effectively increasing the signature requirement applicable to elections for … offices in subdivisions with separate districts"). These cases simply stand for the proposition that a State, in the absence of a compelling reason, may not require more signatures from a candidate for a local office than it does from a candidate for a statewide office. Accordingly, the cases do not support the plaintiffs' contention.

The plaintiffs' retention argument also fails to take into account the express language of the Supreme Court in other ballot access cases. A careful examination of the Supreme Court's opinions reveals that the distinction drawn is not simply between new political parties, that presumably have not demonstrated a modicum of support, and established political parties that have. The Court has also distinguished small political parties from those that have "historically established broad support[.]" *Jenness*, 403 U.S. at 441, 91 S.Ct. at 1976 (quoted in *American Party of Texas*, 415 U.S. at 782 n. 13, 94 S.Ct. at 1306 n. 13). Even though Ross Perot garnered over 902,000 votes in the 1992 election, the Patriot Party has been unable to lure voters to join the Party. With a total of approximately one thousand one hundred members, the Patriot Party is quite small. Moreover, the Patriot Party has not historically demonstrated broad support in Pennsylvania. Indeed, it did not even become a political party until January of this year. Accordingly, it is not inappropriate to require the Patriot Party to utilize nomination papers to secure a position on the ballot for Surrick. Undoubtedly, the Commonwealth has a strong interest in "preserving the integrity of the electoral process and in regulating the number of candidates on the ballot[.]" *Munro*, 479 U.S. at 194, 107 S.Ct. at 537 (citing *American Party of Texas*, 415 U.S. at 782 n. 14, 94 S.Ct. at 1307 n. 14). By requiring small political parties to demonstrate such support the Commonwealth helps further those interests. As the Supreme Court stated in *Jenness*, "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike[.]" *Jenness*, 403 U.S. at 442, 91 S.Ct. at 1976.

The conclusion reached in this case is consistent with the First Circuit Court of Appeals' decision in *Libertarian Party of Maine v. Diamond*, 992 F.2d 365 (1st Cir.1993). In that case, the plaintiffs, by virtue of a Maine statute,[10] became a new political party because an independent candidate in the most recent gubernatorial election, who had received at least 5% of the total Maine vote cast, permitted a political party to be organized around him. *Diamond*, 992 F.2d at

---

9. This court notes that the plaintiffs have not cited any language in the Court's opinion that supports their theory.

10. *See* Me.Rev.Stat.Ann. tit. 21–A, § 302(1).

367. Nevertheless, candidates of such parties were not guaranteed access to the general election ballot. To obtain access, a party candidate had to collect signatures to get on the primary ballot and then prevail in the primary; or if an insufficient number of signatures were collected, win a plurality of the party's primary election write-in vote.[11] *Diamond*, 992 F.2d at 367–68. The Libertarian Party, which had only 1,048 members, failed to satisfy either requirement. It subsequently filed a suit alleging, *inter alia*, that the additional requirements were unnecessary and unconstitutionally burdensome because the party had already demonstrated statewide support. *Diamond*, 992 F.2d at 370. The First Circuit Court of Appeals rejected the argument. The court reasoned that in a situation where the party was so small and had no history of support in earlier elections, "the State retained a legitimate interest in ensuring that the Party *in fact* possessed a minimal level of support . . . as a prerequisite to listing [its] candidates on the . . . general election ballot." *Diamond*, 992 F.2d at 371 (emphasis added). The First Circuit's analysis applies with equal force here.

While it is true that third parties do play a significant role in our country's political development, the interests of such parties must be considered in light of "the States' interest in screening out frivolous candidates." *Illinois State Board of Elections*, 440 U.S. at 185, 99 S.Ct. at 991. In this case, it cannot be said that Pennsylvania's statutory scheme is unconstitutional because the Patriot Party, as a minor political party whose existence barely spans six months, must use nomination papers to place its candidates on the general election ballot.[12] The Supreme Court has already determined that a political party could not cite its success in one location as a sufficient condition for running its candidates in another. *Norman*, —— U.S. at ——, 112 S.Ct. at 708. Thus, it follows that Pennsylvania has a legitimate interest in ensuring a substantial modicum of *candidate* support in addition to any general support that might be imputed to the Party based on Ross Perot's success in the 1992 presidential election. *See Diamond*, 992 F.2d at 372.

### 2) THE 15% RULE

The plaintiffs second attack on the Pennsylvania Election Code is the 15% threshold that distinguishes major political parties from minor ones.[13] Under § 2872.2 all political parties that have less than 15% of the total number of registered voters in the Commonwealth are "minor," and therefore must use nomination papers to secure a candidate's spot on the general election ballot. It follows that parties with 15% or more of the total number of registered voters in Pennsylvania do not have to use that route, and instead may use the primary process to place their candidate on the ballot. The Patriot Party and Surrick contend that the requirement is too onerous because it is based upon registration rather than voter support at the polls, and the percentage required is so large,[14] that an impossible burden has been placed on them.

As a starting point, this court is well aware that "the Constitution gave the states 'wide discretion in the formulation of a system' for electing representatives." *Trinsey v. Commonwealth of Pennsylvania*, 941 F.2d 224, 231 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 658, 116 L.Ed.2d 750 (1991), (quoting *United States v. Classic*, 313 U.S. 299, 322, 61 S.Ct. 1031, 1041, 85 L.Ed. 1368

---

**11.** These requirements are also governed by Maine's statutes. *See* Me.Rev.Stat.Ann. tit. 21–A, §§ 335(5) and 723(1)(A), respectively.

**12.** The Patriot Party implies that all of the effort expended for Perot in 1992 will be for naught if its candidates for 1993 must also use nomination papers to obtain access to the general election ballot. What the Patriot Party fails to realize is that they are now recognized as a political party in Pennsylvania solely because of their efforts in 1992.

**13.** This court notes that this argument is ostensibly a corollary to the Patriot Party's retention claim. The retention claim is premised on the theory that a minor political party should not have to re-establish continually its support. The 15% rule is merely the mechanism that causes a minor political party to re-establish its support.

**14.** In fact, the plaintiffs contend that the requirement in Pennsylvania is greater than that of any other state in the country that uses a registration requirement.

(1941)). Moreover, any statute enacted by the legislature is presumed to be constitutional. *Clements*, 457 U.S. at 957, 102 S.Ct. at 2840. Accordingly, this court must not over-zealously substitute its judgment for that of the Pennsylvania legislature.

■ The Supreme Court has never drawn a bright line to distinguish valid exercises of legislative authority from unconstitutional abuses of legislative authority; nor has the Court required states to utilize a particular method or process to determine how the general election ballot will be filled. Indeed, the Court has specifically found that "a classification is not deficient simply because the State could have selected another means of achieving the desired ends." *Clements*, 457 U.S. at 969, 102 S.Ct. at 2846 (citations omitted). This is so because the Constitution [15] gives the states ample leeway to regulate their elections. *See also, Burdick*, —— U.S. at ——, 112 S.Ct. at 2063 (observing that "common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections"). Thus, it is constitutionally permissible that the Pennsylvania legislature has hinged major party status on voter registration rather than the number of votes received by one of its candidates at the most recent election or some other criteria.

■ The remaining issue then is whether the 15% threshold is so onerous that it is constitutionally infirm. It is manifest that any fixed percentage requirement is "necessarily arbitrary." *American Party of Texas*, 415 U.S. at 783, 94 S.Ct. at 1307. As the Eleventh Circuit Court of Appeals has stated in its discussion of the propriety of a fixed percentage: "it would probably be impossible to defend it as either compelled or least drastic." *Libertarian Party of Florida v. State of Florida*, 710 F.2d 790, 793 (11th Cir.1983), *cert. denied*, 469 U.S. 831, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984). It is not for this court to determine the optimal percent-

age for the Pennsylvania legislature to adopt for major political parties. Instead, this court must "determine whether the challenged laws 'freeze' the status quo by effectively barring all candidates other than those of the major parties." *Libertarian Party of Florida*, 710 F.2d at 793 (citing *Jenness*, 403 U.S. at 439, 91 S.Ct. at 1974–75).

Unquestionably, there are numerous state interests that are advanced by application of registration requirement. The provision certainly helps to avoid ballot clutter and reduces the probability that frivolous candidates will appear on the general election ballot. *See Munro*, 479 U.S. at 194–95, 107 S.Ct. at 536–37. The restriction also helps voters cast more meaningful votes because over-crowded ballots tend to confuse and frustrate voters at the general election. *See Lubin v. Panish*, 415 U.S. 709, 715–16, 94 S.Ct. 1315, 1319–20, 39 L.Ed.2d 702 (1974); *Jenness*, 403 U.S. at 442, 91 S.Ct. at 1976. Similarly, there is a legitimate interest in assuring that "the winner is the choice of a majority, or at least a strong plurality." *Bullock*, 405 U.S. at 145, 92 S.Ct. at 857. Finally, the Commonwealth has an interest in ensuring that the general election is reserved for "major struggles." *See Munro*, 479 U.S. at 196, 107 S.Ct. at 538 (citing *Storer*, 415 U.S. at 735, 94 S.Ct. at 1281–82).

■ On the other hand, the Patriot Party and Surrick contend that Pennsylvania's registration requirement is the most stringent one in the country. This court recognizes that at a certain point an increased percentage ceases to further legitimate state interests and operates exclusively to hinder development of a new political party.[16] Nevertheless, a ballot access provision is not unconstitutional simply because it is more burdensome than a similar provision of another state. To hold otherwise would lead to absurd results. The most rigid requirement would be "challenged and judicially reduced,

---

**15.** Art. I, § 4, cl. 1 of the Constitution provides that "[t]he Times, Places and Manner of holding elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof."

**16.** As an extreme example, if the legislature passed a 51% registration requirement, then by definition it would impossible for more than one party gain automatic access to the ballot. Such a provision would clearly be unconstitutional. The 15% threshold, on the other hand, leaves room for up to six major parties in Pennsylvania.

and then again, and again until [the requirement] did not exist at all." *Libertarian Party of Florida,* 710 F.2d at 790.

In this case, the 15% threshold requires a new political party to work exceedingly hard to attain an automatic position on the general election ballot. The requirement, however, is similar to that imposed by Georgia in *Jenness.* In that case, a political organization gained automatic access to the general election ballot only if one of its candidates received 20% or more of the votes in the most recent gubernatorial or presidential election. Otherwise, the political organization would have to secure signatures of 5% of the number of registered voters at the last general election. *Jenness,* 403 U.S. at 432–33, 91 S.Ct. at 1971–72. The Court upheld the constitutionality of the process. *Jenness,* 403 U.S. at 440–442, 91 S.Ct. at 1975–1976. While there is a distinction between receiving a percentage of votes to qualify automatically for the general election ballot and having an organization obtain a percentage of the registered voters in the state to qualify, such a distinction is not of constitutional magnitude.[17] The Pennsylvania law neither invidiously discriminates against minor political parties, nor freezes the status quo. Small political parties are still free to associate and unite their efforts in order to garner signatures for the nomination papers.

Finally, it should be noted that the 15% requirement, at worst, precludes *automatic* placement on the general election ballot. It,

however, in no way stymies ballot access to all candidates who do not belong to a major political party. Because the Patriot Party has only 1100 members, which is 0.018% of the total number of registered voters in Pennsylvania,[18] the Commonwealth may reasonably require the party's candidates to demonstrate additional support before placing them on the general election ballot. Any serious candidate of a minor political party or political body may avail himself of the nomination papers route to secure a spot on the general election ballot. *See American Party of Texas,* 415 U.S. at 787, 94 S.Ct. at 1309 (observing that "hard work and sacrifice are the lifeblood of any political organization").

The court is aware that Pennsylvania's approach to a certain extent creates "Catch–22," [19] and that a different process or a lower percentage would also further Pennsylvania's interests. Nevertheless, "the wisdom of [the law] may not color [the court's] task of constitutional adjudication." *Clements,* 457 U.S. at 973, 102 S.Ct. at 2848. This court holds that the 15% rule is demanding, but that it is also within the outer limit of the constitutional realm for purposes of equal protection and freedom of association.

### 3) THE 2% RULE

■ At the hearing, the plaintiffs also urged that the 2% rule is violative of the Constitution because as applied to the Patriot Party it does not further Pennsylvania's interest in avoiding ballot clutter. *See Tran-*

**17.** It is interesting to note that had Pennsylvania employed the same threshold test as Georgia did in *Jenness,* the Patriot Party would still be relegated to the nomination paper route because Perot did not receive 20% of the votes cast in Pennsylvania. He received 902,667 of the 4,959,790 votes cast, *see* Defendant's Exhibit 2, which turns out to be 18.2% of the vote.

**18.** Defendants' Exhibit 1 contains official voter registration statistics as of November 3, 1992. The total number of registered voters is 5,993,-002. 1,100 is equal to 0.018% of 5,993,002. The court notes that the number of voters and distribution of voters may have changed since that time, but any change would not be significant.

The plaintiffs' urge that four other states have voter registration as a criterion for third party ballot access: Maryland 10%, Florida 5%, Dela-

ware 0.05%, and California 0.067%. *See* Brief of Plaintiff Robert B. Surrick at p. 3 n. 1. Assuming these to be true because such evidence was not admitted at the hearing, *see* Transcript at p. 106, the Patriot Party would still not qualify in any of those states. It is also noteworthy that although 0.018 is almost four times less than 0.067, California also requires a vote of 2% for any statewide race. Accordingly, the Patriot Party would fail to qualify not only because it has an insufficient number of registered voters, but also because it has never had a candidate run for a statewide office.

**19.** On one hand, a political organization will proselytize voters through the actions of its members that hold an elected office. Yet, if the party cannot consistently obtain ballot access for its candidates, then the party cannot gain public support.

script at pp. 70–78;[20] Plaintiffs' Post–Hearing Memo at p. 7; Brief of Plaintiff Robert B. Surrick at p. 5. Under § 2911, access to the general election ballot may be secured by obtaining signatures of 2% or more of the largest number of votes cast in the last preceding election. The plaintiffs do not challenge the facial validity of the 2% requirement for nomination papers. Instead, they object that because the law requires candidates of minor political parties to refer to the most recent election, and because statewide judicial elections in Pennsylvania always follow either presidential or gubernatorial elections, access to the general election ballot for judicial candidates is unduly difficult.

The plaintiff's decision not to challenge the facial validity of Pennsylvania's 2% requirement is a wise one. In *Jenness,* the Supreme Court upheld a law that required a candidate of a political organization to garner signatures totaling 5% in order to obtain access to the general election ballot. Thus, *a fortiori,* it is beyond dispute that Pennsylvania's 2% requirement is facially valid. Moreover, the validity of the 2% rule was recently challenged and upheld by the court in the Middle District of Pennsylvania. *See Perry v. Grant,* 775 F.Supp. 821, 826–27 (M.D.Pa. 1991). Nevertheless, the Supreme Court has on two separate occasions invalidated facially valid ballot access laws because of their *application* to a political party. *See Illinois State Board of Elections* and *Norman, supra.*

In *Illinois State Board of Elections,* candidates of new political parties had to obtain 25,000 signatures to appear on the general election ballot in statewide elections; however for offices of political subdivisions, they had to obtain 5% of the number of persons who voted at the previous election for offices of the particular subdivision to secure a position. *Illinois State Board of Elections* 440 U.S. at 175–76, 99 S.Ct. at 985–86. The 5% standard exacted fewer than 25,000 signa-

tures in every political subdivision, except for Chicago and Cook County. *Illinois State Board of Elections* 440 U.S. at 177 n. 3, 99 S.Ct. at 986 n. 3. In those two areas, application of the law produced the anomalous result that more signatures were needed for local offices than for statewide offices. The law was found to be unconstitutional as applied to those subdivisions. The Court reasoned that the Illinois legislature had determined that its legitimate interest in avoiding ballot clutter would be satisfied by the 25,000 signature requirement. *Illinois State Board of Elections* 440 U.S. at 177, 99 S.Ct. at 986. However, it could not discern, nor could the state advance, a reason why more votes would be necessary for a local office. *Illinois State Board of Elections,* 440 U.S. at 186–87, 99 S.Ct. at 991–92.

In response to the Court's ruling, the Illinois legislature capped the 5% rule at 25,000 signatures, but the legislature also required that 5% rule be met in each district of the political subdivision. *Norman,* —— U.S. at ——, 112 S.Ct. at 702. The effect of the provision required candidates in Cook County to acquire 50,000 signatures because the County was comprised of two very large districts. *Norman,* —— U.S. at —— – ——, 112 S.Ct. at 707–08. The Supreme Court again struck down the statute because it retained the same "constitutional flaw at issue in *Socialist Workers.*" *Norman,* —— U.S. at ——, 112 S.Ct. at 707.

In this case, the defendants do not attempt to distinguish this case from the Supreme Court cases. Instead, they contend that *Perry,* 775 F.Supp. at 827–28, is controlling. *See* Defendants' Reply Brief at p. 10; Defendants' Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction at p. 19. In that case, the plaintiffs claimed, *inter alia,* that the 2% rule was unreasonably burdensome as applied because the number of signatures required for a senatorial candidate in a particular election was higher than it had

---

**20.** The defendants contend that the plaintiffs have "conceded" the constitutionality of the 2% rule *and* its application to the Patriot Party. Defendants Reply Brief at pp. 9–10. This court disagrees. The post-hearing briefs serve to augment, not supplant, the record established at the hearing. Transcript at pp. 126–135. The major-

ity of plaintiff Surrick's testimony covers the problem with the rule as it is applied to a candidate for the Supreme Court of Pennsylvania or any other judicial office. Additionally, Plaintiffs' Exhibit 7, which the defendants did not object to, specifically corroborates Surrick's claims.

been previously. The court correctly held that a fluctuation in the number of signatures required does not render the 2% rule unconstitutional. *Perry*, 775 F.Supp. at 828. The court in *Perry* relied upon *Rainbow Coalition v. Oklahoma State Election Board*, 844 F.2d 740, 744 (10th Cir.1988).

In that case, in order to become a new political party, an organization had to obtain signatures equalling 5% of the number of votes cast in the most recent gubernatorial or presidential election. The gubernatorial and presidential election alternated every two years. *Rainbow Coalition*, 844 F.2d at 742. Because more people voted in presidential than gubernatorial elections, the number of signatures required to form a party in a gubernatorial year was larger than the amount required to form a party in the presidential year.

The court upheld the law because, unlike *Illinois State Board of Elections*, the statute furthered a legitimate state interest. *Rainbow Coalition*, 844 F.2d at 744. The court concluded that the most recent voter turnout was the best gauge of how many voters were interested in joining a new political party, and therefore was a legitimate state interest. *Rainbow Coalition*, 844 F.2d at 744.

This case is clearly distinguishable from the facts in *Perry* or *Rainbow Coalition*. In those cases the gravamen of the complaint was that the treatment of the same statewide office or political party unconstitutionally varied from year to year. In this case, the plaintiffs do not attack the 2% requirement because a judicial candidate in Pennsylvania will need a different number of signatures in 1993 than he did in 1991. The thrust of their argument is that it is continually much more difficult for a minor party judicial candidate to gain access to the general election ballot

than it is for a minor party presidential or gubernatorial candidate.

To determine if the 2% rule as applied to any judicial candidate of a minor political party or political body is unconstitutional it is necessary to examine the "nature, extent and likely impact" of the law. *Storer*, 415 U.S. at 738, 94 S.Ct. at 1283. This determination, especially in the context of an "as applied" challenge, cannot be determined in a vacuum. "[T]o assess realistically whether the law imposes excessively burdensome requirements upon [third party] candidates it is necessary to know ... critical facts...." *Storer*, 415 U.S. at 738, 94 S.Ct. at 1283. In *Storer*, the Court remanded the case to the district court because the evidentiary record did not contain enough information for it to determine whether the 5% signature requirement was unduly burdensome. *Storer*, 415 U.S. at 738–40, 94 S.Ct. at 1283–84. This record, however, is replete with facts that enable this court to make a determination.

Over the past eight years there have been four judicial elections [21] and four presidential or gubernatorial elections. Under the 2% rule, as the table [22] shows, the signatures required to obtain access to the general election ballot for a judicial position has been strikingly higher. Thus, on average, in the past four elections for each category, judicial candidates have needed to secure 45,519 signatures to gain access to the general election ballot, while presidential or gubernatorial candidates have needed to secure 25,197 signatures. Indeed, the lowest number of votes needed for a judicial office in that period is still approximately 31% higher than the largest number of votes needed for a presidential or gubernatorial office. Similar results occurred for the elections from 1978 through 1983. In those years, the average number of

---

**21.** In each of these years there has been at least one vacancy on the Pennsylvania Supreme Court, the Superior Court, or the Commonwealth Court.

**22.**

| JUDGE | | PRESIDENT/ GOVERNOR | |
|---|---|---|---|
| Election Year | Signatures Needed | Election Year | Signatures Needed |
| 93 | 56,640 | 92 | 29,172 |
| 91 | 41,305 | 90 | 24,857 |
| 89 | 46,002 | 88 | 25,568 |
| 87 | 38,128· | 86 | 21,190 |

signatures required in an even year was 40,-719, while the number for odd years was 24,900.

This disparity is even more disturbing when compared to the number of signatures that a candidate of a major political party must obtain to get on the primary ballot. Under 25 Pa.Stat.Ann. § 2872.1, a presidential or gubernatorial candidate must obtain 2,000 valid signatures on a nominating petition to be placed on the primary ballot, while a candidate for the Supreme Court, Superior Court, or Commonwealth Court must obtain only 1,000 signatures. The Pennsylvania legislature has therefore determined that, for purposes of access to the primary ballot, candidates of major political parties who seek a judicial office must obtain *one-half* the amount of signatures that candidates who seek President of the United States or Governor of Pennsylvania do. Yet the effect of § 2911(b) requires candidates of minor political parties who run for a judicial office to obtain *substantially more* signatures than those minor party candidates who seek the office of President of the United States or Governor of Pennsylvania. Surely, if the legislature intended that a judicial candidate of a major party encounter an easier path to ultimately qualify for the general election ballot, it would intend a similar result for judicial candidates of minor political parties.

▮ Ballot access laws that appear to arbitrarily discriminate against minor political parties have been subjected to strict scrutiny. Thus, in the absence of a compelling state interest, *see Illinois State Board of Elections,* 440 U.S. at 186, 99 S.Ct. at 991, or the use of the most narrowly tailored means to advance a state interest, *see Norman,* ─── U.S. at ───, 112 S.Ct. at 708, it is not constitutional to require candidates of minor political parties to obtain more signatures for local offices than for state offices. Therefore, it must not be constitutional under the Equal Protection Clause to require them to obtain a greater number of signatures for a less significant office[23] than for a more significant one, especially where the opposite is true for major party candidates.

▮ The Commonwealth has not advanced any interests that tend to support this peculiar result. On the contrary, at least one other jurisdiction has found that a state has a substantial interest in holding Senate vacancy elections only in even-numbered years because significantly fewer people voted in odd-numbered years. *Valenti v. Rockefeller,* 292 F.Supp. 851, 859 (S.D.N.Y. 1968), *aff'd,* 393 U.S. 404, 405, 406, 89 S.Ct. 693, 689, 693, 21 L.Ed.2d 635, 635, 636 (1969) (cited with approval in *Trinsey,* 941 F.2d at 233). Thus, this interest would be better served if the legislature adopted a different mechanism to demonstrate support for a judicial candidate of a minor political party. To that end, there appear to be a variety of less intrusive ways to advance the Commonwealth's interest in having an uncluttered ballot. For example, the Commonwealth could cap the amount of signatures that judicial candidates need at whatever number was required for the most recent gubernatorial or presidential third party candidate. It could also base the 2% number on the most recent judicial election. A third option could be to substitute for the percentage a hierarchical scale of fixed numbers, which would demonstrate a significant modicum of support, in a fashion similar to § 2872.1. Accordingly, this court will arrange a hearing forthwith to determine an appropriate remedy. *See* Transcript at pp. 135–36.

## 4) THE TOTALITY OF PENNSYLVANIA'S SCHEME

▮ It is also suggested by the plaintiffs that overall scheme of the Pennsylvania Election Code unjustifiably favors the Democratic and Republican parties. The totality concept is "applicable only in the sense that a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights." *Storer,* 415 U.S. at 737, 94 S.Ct. at 1282. In *Williams,* the Court found that the totality of the Ohio laws invidiously discriminated

---

23. In no way does this court intend to deprecate the importance of being a state court judge in Pennsylvania. The significance of the office is based solely upon the hierarchical distinctions drawn by the state legislature.

942

against third parties in violation of the Equal Protection Clause. *Williams,* 393 U.S. at 34, 89 S.Ct. at 12. In that case Ohio law required new political parties to signatures totaling 15% of the number of ballots cast in the last preceding gubernatorial election. The petitions containing the signatures had to be filed no later than February 7, 1968, the year of the election. After that was accomplished, the state imposed on third parties a "Procrustean requirement of establishing elaborate primary election machinery." *Jenness,* 403 U.S. at 438, 91 S.Ct. at 1974 (citing *Williams,* 393 U.S. at 25 n. 1, 89 S.Ct. at 7 n. 1). Pennsylvania's procedures do not approach the severity of the restrictions in *Williams.* First, the window of opportunity for a minor political party's candidates to obtain the necessary signatures is much greater. Second, the nominating papers may be signed by any qualified elector of the State. *See* 25 Pa.Stat.Ann. § 2911(c). Third, once the constitutional deficiencies with § 2911(b) are cured, minor political party candidates will not have to obtain an unreasonable number of signatures. Fourth, after the requisite number of signatures are secured there are no hurdles that prevent access to the general election ballot. In short, the Election Code does not permit Democrats and Republicans to monopolize the ballot.

### III. CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction over the controversy pursuant to 28 U.S.C. §§ 1331, 1343.

2. This court has in personam jurisdiction over the parties who have appeared in person and through counsel.

3. Proper venue lies in this jurisdiction.

4. Abstention is inappropriate in this case.

5. The statutory requirement that minor political parties and their candidates must continually re-establish their support does NOT render 25 Pa.Stat.Ann. § 2872.2 unconstitutional.

6. The 15% registration requirement contained in 25 Pa.Stat.Ann. § 2872.2 is NOT unconstitutional.

7. 25 Pa.Stat.Ann. § 2872.2 in combination with 25 Pa.Stat.Ann. § 2911(b) is unconstitutional as applied to the Patriot Party and Surrick because the 2% signature requirement on the nomination papers violates the Equal Protection Clause.

### ORDER

AND NOW, this 29th day of June, 1993, upon consideration of the testimony adduced at the final hearing on May 21, 1993, all pre-hearing and post-hearing briefs filed by the parties, and for the reasons set forth in the accompanying Opinion, IT IS ORDERED that:

1) 25 Pa.Stat.Ann. § 2911(b) is UNCONSTITUTIONAL as applied to the plaintiffs because the 2% signature requirement violates the Equal Protection Clause.

2) All other provisions of the Pennsylvania Election Code that have been challenged by the plaintiffs are NOT UNCONSTITUTIONAL.

3) A hearing will be held to determine an appropriate remedy on July 6, 1993, at 10:00 A.M. in Courtroom 17A, United States Courthouse, Philadelphia, Pennsylvania.